Karen K. ORR, Plaintiff,

v.

Shirley S. CHATER, Commissioner,
Social Security, Defendant.

No. C 96–3022–MWB.

United States District Court,
N.D. Iowa,
Central Division.

Feb. 18, 1997.

Thomas A. Krause, Kansas City, MO, for Plaintiff Karen K. Orr.

Ana M. Martel, U.S. Attys. Office, N.D. Iowa, Cedar Rapids, IA, for Defendant Shirley Chater.

## MEMORANDUM OPINION AND ORDER REGARDING COMMISSIONER'S DENIAL OF SOCIAL SECURITY DISABILITY BENEFITS

BENNETT, District Judge.

### TABLE OF CONTENTS

I.  INTRODUCTION ...................................................863
    A.  Procedural Background ....................................863
    B.  Factual Background .......................................863
        1.  Introductory facts and daily activities ...............863
        2.  Orr's work and medical history .......................864
        3.  Vocational expert's testimony ........................868
        4.  The ALJ's conclusion ...............................868
    C.  The Court's Jurisdictional Basis..........................869

II. ANALYSIS ......................................................869
    A.  The "Substantial Evidence" Standard ......................869
    B.  The Polaski Standard and Subjective Pain Credibility Determinations.........870
    C.  Relative Burdens of Proof ...............................871

D. Review Of The ALJ's Decision ........................................872
    1. Orr's subjective pain complaints—the Polaski analysis ...................872
        a. Observations by treating and examining physicians..................873
        b. Observations of third parties ......................................873
        c. Orr's prior work record.........................................873
        d. Analyzing the evidence in light of the Polaski factor .................874
    2. The ALJ's hypothetical...........................................875

III. CONCLUSION .....................................................877

This Social Security disability case requires the court to analyze an administrative law judge's decision to deny a plaintiff disability insurance benefits. Ultimately, this case is a question of the extent to which the plaintiff's recurring seizures and headaches render her unable to perform work which exists in substantial numbers in the national economy. To evaluate the plaintiff's claim, the court must address the plaintiff's two issues. First, the plaintiff argues the ALJ's decision to discount her subjective complaints of pain resulting from recurring seizures and headaches was erroneous. To evaluate the ALJ's analysis of the plaintiff's complaints, the court must apply the Eighth Circuit's ubiquitous *Polaski* standard. The Commissioner argues, in making his decision, the ALJ employed the *Polaski* standard correctly and, therefore, there exists substantial evidence on the record as a whole to uphold the ALJ's decision.

Second, the plaintiff argues the hypothetical question the ALJ posed to the vocational expert was flawed because her recurring seizures and headaches limit her ability to maintain attention and concentration and to perform work in a competitive environment, to a greater extent than the ALJ's hypothetical expressed. To evaluate the plaintiff's second issue, the court must review the Eighth Circuit's recent jurisprudence on Social Security hypotheticals. The Commissioner argues, in making his decision, the ALJ followed the Eighth Circuit's dictate that he incorporate all the limitations he believed were substantially supported by the record as a whole and, therefore, there exists substantial evidence on the record as a whole to uphold the ALJ's decision.

## I. INTRODUCTION

### A. Procedural Background

Karen K. Orr filed for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq., on April 13, 1993. (Tr. 111–14, 138.). Orr also filed for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., on April 28, 1993. (Tr. 138–40.). Orr was denied benefits on August 25, 1993. (Tr. 104–05, 123–24.). Orr requested reconsideration on August 31, 1993, (Tr. 121), but was denied on October 28, 1993. (Tr. 99–100, 116–17.). Orr requested a hearing on November 1, 1993, (Tr. 97.), and one was held on July 15, 1994. (Tr. 60.). After the hearing, on September 25, 1994, administrative law judge (ALJ) John P. Johnson issued an order denying benefits to Off. (Tr. 21–35.). Orr filed a timely request for review on November 3, 1994, (Tr. 11–12.), but the Appeals Council affirmed the ALJ's decision denying benefits and that decision now stands as the final decision of the Commissioner. (Tr. 6–7.). In reaching its decision, the Appeals Council considered additional medical records Orr submitted which were created after the hearing in front of the ALJ. (Tr. 363–94.). Having exhausted her administrative remedies, Orr filed for judicial review in this court. Both parties agree the application was timely filed. It is now appropriate for this court to review Orr's application pursuant to 42 U.S.C. § 405(g) and determine if the Commissioner's decision was supported by substantial evidence on the record as a whole.

### B. Factual Background

#### 1. Introductory facts and daily activities

The plaintiff in this case is Karen K. Orr. Orr was born December 16, 1948, and was forty-five years old at the time of the hearing. (Tr. 66.). She testified she measured

5'3" and weighed 180 to 182 pounds. (Tr. 66.). She is divorced. (Tr. 67.). She does not have a driver's license. (Tr. 67.). Orr graduated from high school in 1967 and earned an Associates of Arts degree in general studies in 1990. (Tr. 68.). Orr has a little more than one year of schooling before she will have earned a bachelor's degree. (Tr. 68.). Orr alleges she became disabled in December 1991. (Tr. 68.). Orr alleges her disability is the result of a combination of uncontrollable seizures, migraine headaches, a medical disorder resulting in leg weakness, and depression. (Tr. 74–81.).

Orr lives, rent free, in low-income housing and receives food stamps. (Tr. 81.). Each night, Orr goes to bed at midnight after watching a rerun of the television program "Designing Women" and wakes up anywhere between 3:00 a.m. and 8:00 a.m. (Tr. 82.). Orr showers by herself. (Tr. 82.). In the morning Orr eats breakfast and then either reads or watches television, but has trouble concentrating during either activity. (Tr. 82–83.). Occasionally, she visits two elderly ladies who live in her building. (Tr. 83.). In the afternoon Orr eats lunch, watches soap operas and falls asleep until 3:00 p.m. (Tr. 83.). In the evening, after she eats dinner, Orr watches situation comedies on television, or tries to work crosswords or jigsaw puzzles. (Tr. 83–84.). Occasionally, Orr takes part in her community theater, although in the past year she has done very little with the troupe. (Tr. 84–85.). Orr stopped acting because she was afraid she would have a seizure in the presence of people she respected. (Tr. 84–85.). Prior to that, Orr was involved in all aspects of the theater including infrequent acting roles. (Tr. 84.). Orr's only hobby is reading and she sometimes reads cheerleader stories to her teen-age niece. (Tr. 85.). Orr takes care of most of the chores around her house but does not dust. (Tr. 85.).

Since July 1993, Orr has not worked for money. (Tr. 72–73.). Orr testified she does not work because she suffers from three to six seizures a month. (Tr. 73.). During the seizures, Orr is incontinent of urine and when she regains consciousness she has rug burns and bruises but has not usually bitten her tongue. (Tr. 80.). The next day Orr feels like a zombie and only wants to sleep. (Tr. 81.). Each day Orr takes 600 milligrams of the anti-seizure medicine, Dilantin. (Tr. 74.). She also takes Ditropan, Paxil, Lorazepam and Inderal daily. (Tr. 74–75.). County relief pays for some of Orr's medications. (Tr. 81.). When Orr has seizures, she will be walking or standing and then, the next thing she knows, she is on the floor or ground. (Tr. 75.). When Orr climbs a long flight of stairs her leg muscles are tired by the time she reaches the top step. (Tr. 76.). Orr also has trouble standing up and holding her twenty-three pound granddaughter but she has no trouble using her hands. (Tr. 76.). Orr has a slight problem concentrating on day-to-day types of things and handling stress. (Tr. 76–77, 78.). Orr does not get along well with her neighbors or acquaintances. (Tr. 78.). Orr sees professionals at the North Iowa Mental Health Center who help her with her emotional problems. (Tr. 79.). Orr also has migraine headaches which can be so severe she needs to go to a hospital emergency room and receive a hypodermic injection for relief. (Tr. 73.). After an injection Orr wants only to sleep for twenty-four hours. (Tr. 73.). Orr also takes Phenergan and Vistaril as needed for headaches. (Tr. 75.). The headaches often antecede her seizures. (Tr. 80.).

Orr's daughter, Denise Orr, testified at the hearing. Denise lives in Clarion, Iowa, while Karen Orr lives in Webster City, Iowa. (Tr. 86.). Denise sees her mother once a week, and in her experience, Karen's testimony was accurate. (Tr. 86.). For the year prior to the hearing, Denise testified her mother "sleeps all the time" and "is always tired, always got a headache, cranky." (Tr. 86.). Denise has never seen her mother have a seizure, but has seen her the day after and finds her to be tired and "dopey" the entire next day. (Tr. 86–87.). Denise used to allow her mother to care for her daughter, but she no longer trusts her to do that because of Karen's seizures. (Tr. 87.).

### 2. Orr's work and medical history

Orr's past work experience includes that of a certified nurse's aid in a nursing home

where she aided residents with grooming, bathing, dressing and walking. She also took vital signs. (Tr. 68.). She worked from June 1991 to July 1993. (Tr. 68, 72.). Before she left her last job Orr was "very bitchy." (Tr. 78.). She did not assist nurses with medications or injections. (Tr. 68.). In that job, Orr worked standing up virtually all the time and had to lift more than 100 pounds. (Tr. 69.). Prior to her work as a CNA, Orr was a supervisor at a sheltered workshop, Iowa Central Industries, in Fort Dodge in 1987. (Tr. 69–70.). In that job, Orr helped developmentally disabled adults sort aluminum cans. (Tr. 70.). At that job, Orr had to lift up to fifty pounds. (Tr. 71.). Prior to that job, Orr worked at a state school as a registered care technician (RCT) from 1985–87. (Tr. 71.). At that job, Orr supervised profoundly retarded adults. (Tr. 71.). Prior to that job, Orr worked at a military dining hall as a food service worker. (Tr. 72.). There, Orr prepared food, cleaned tables and performed other cafeteria-type jobs. (Tr. 72.). In that job, Orr had to lift more than 100 pounds. (Tr. 72.).

On November 16, 1991, Dr. Josefina Hizon described in medical records how Orr was admitted to the Trinity Regional Hospital in Fort Dodge on November 13, 1991, and stayed for four days. Orr was admitted because she was suffering from panic attacks and the fear of nightmares involving the sexual abuse she suffered as a child at the hands of her father. (Tr. 189, 191.). Dr. Hizon diagnosed Orr as having post-traumatic stress disorder which resulted in restlessness and the inability to concentrate. (Tr. 189, 191.). Dr. Hizon found stressors included flashbacks from sexual abuse, going to work and working on a full-time basis. (Tr. 189.). Dr. Hizon prescribed twenty-five milligrams of librium, one-half milligram of Choloral Hydrate and fifty milligrams of Desyrel as daily dosages. (Tr. 189.). On November 21, 1991, Dr. Hizon again reported Orr was suffering nightmares. (Tr. 216.).

On November 24, 1991, according to Dr. Hizon's notes, Orr was readmitted to Trinity Regional Hospital for depression and suicide threats. (Tr. 195.). Dr. Hizon wrote she did not think Orr was ready to return to the job

she had held. (Tr. 195.). Dr. Hizon also found Orr to be "manipulative" and "demanding" and seeking special privileges. (Tr. 195.). Dr. Hizon believed Orr was telling people what they wanted to hear and was "playing games" with the staff. (Tr. 195.).

On December 5, 1991, Dr. Hizon reported Orr was "doing much better." (Tr. 214.). On December 9, 1991, Dr. Hizon reported Orr was "looking a lot better." (Tr. 214.). Another unnamed doctor has diagnosed Orr with cardiac arrhythmia, an irregular heart beat. (Tr. 214.). On December 23, 1991, Dr. Hizon reported Orr looked "fairly well" and was about ready to return to work. (Tr. 213.). On January 6, 1992, Dr. Hizon reported Orr was having frequent panic attacks on the job. (Tr. 212.). On January 13, 1992, Dr. Hizon reported that Orr was getting enough sleep, but not continuous sleep. (Tr. 211.). Dr. Hizon also reported Orr looked good and was feeling more positive about herself. (Tr. 211.).

On April 16, 1992, Dr. Hizon reported Orr had been under her care for a year due to her tremendous problems with not being able to sleep. Though Orr had tried many different medications, none had proved successful. (Tr. 219.). On April 21, 1992, Dr. Hizon reported Orr was again admitted to Trinity Regional Hospital for severe depression and suicidal thoughts on April 17, 1992. (Tr. 218.). While in the hospital, Orr also saw Dr. J.J. Landhuis, who reported Orr suffered almost constant headaches for the past two years, as well as more severe "migraine" headache which occurred four or five times a year. (Tr. 220.). At that time, Orr was not suffering from seizures. (Tr. 220.). Dr. Landhuis also reported Orr suffered from anxiety attacks and arthritis. (Tr. 220, 221.). Dr. Hizon also noted Orr was having trouble sleeping, having anxiety spells and was withdrawn and flat. (Tr. 218.). Dr. Hizon wrote that Orr was discharged on April 21, 1992, and was not now depressed and believed she could "handle it at home." (Tr. 218.).

On June 5, 1992, Orr underwent a CT examination of the head administered by Dr. K.F. Lacey. (Tr. 229.). Dr. Lacey's report stated, "No abnormality is noted." (Tr. 229.). On June 19, 1992, Dr. Juval T. Raval

examined Orr for seizures she had been suffering. (Tr. 230.). Dr. Raval described a seizure Orr suffered where she lost control of her body and woke up the next morning with sore muscles and noticed she had been incontinent of urine. (Tr. 230.). Dr. Raval also described headaches Orr suffered where the pain was strong enough that she became nauseous and eventually vomited. (Tr. 230.). Dr. Raval prescribed the anti-convulsant medicine Dilantin for Orr. (Tr. 231.). Dr. Raval also told Orr Iowa law prohibited her from driving until she had been seizure free for six months. (Tr. 232.). Dr. Raval also told Orr she should not handle patients by herself in case she had a seizure. (Tr. 232.). Dr. Raval also administered an EEG test which showed, "Abnormal EEG because of focal slowing over the left frontotemporal region without any clinical seizure activity." (Tr. 233.).

On September 8, 1992, Orr visited Dr. Joshua Kimelman, at the Hamilton County Public Hospital for back pain. (Tr. 236.). Dr. Kimelman found Orr had a back sprain, but not occult disc disease. (Tr. 236.). Orr denied bowel or bladder incontinence. (Tr. 236.). Orr visited Dr. Kimelman again on September, 22, 1992, and the doctor reported her pain was improving and placed her on a light duty work restriction and gave her a twenty-five pound lifting restriction. (Tr. 238.).

On January 22, 1993, Orr was admitted to the Trinity Regional Hospital for her headaches. (Tr. 252.). Dr. E.D. DeHaan prescribed a shot of Compazine and Restoril to alleviate the pain. (Tr. 252.). The next day, while Orr was still hospitalized, she developed more headaches and was given another shot. (Tr. 252.). Dr. DeHaan discussed how Orr's emotional state affected her headaches. (Tr. 252.). He also reported her headaches were made worse by light and movement and made better by vomiting or sleeping. (Tr. 253.). Dr. DeHaan also conducted an EEG test on Orr which caused him to seriously consider the diagnosis of a seizure disorder. (Tr. 253.). At that visit Orr also complained of seizures and sleepwalking. (Tr. 252.).

On April 8, 1993, Dr. Raval reported Orr suffered one or two headaches in a week and sometimes only one or two in a month. (Tr. 266.). Sometimes the headaches lasted three or four days, and were usually associated with nausea and vomiting. (Tr. 266.). On April 21, 1993, Dr. Raval described the results of Orr's MRI test. Dr. Raval wrote, "MRI of the brain on 4/15/93 was abnormal. Radiologist thinks there could be either multiple sclerosis or lacunar infarction." (Tr. 267.). The doctor who administered the MRI, Dr. C.P. Pun, wrote in the "Impression" section of his report:

Abnormal localized increased signal intensity in the deep white matter and the pons. . . . The possibility of multiple sclerosis and/or lacunar infarction and infarction involving the pons should be considered and correlated clinically. The other possibilities causing increased signal intensity in the deep white matter include aging process, post radiation gliosis. Leukoencephalopathy [1] and leukoencephalitis [2] could have similar findings. Otherwise normal enhanced MRI of the brain.

(Tr. 268.).

On May 10, 1993, Dr. Hizon reported Orr was very depressed, unable to sleep well and had no drive or motivation. (Tr. 329.). On May 19, 1993, Dr. Raval reported Orr was having two to three seizures per month which also caused her to be incontinent of urine and left her feeling as if she had been "hit by a truck." (Tr. 269.). Raval also reported Orr's headaches were associated with photophobia and phonophobia. (Tr. 269.). Dr. Raval also reported Orr suffers from headaches almost every day. (Tr. 269.). Dr. Raval also reported, "It is likely that Ms. Orr also suffers from partial complex seizures with secondary generalization, despite

---

1. Leukoencephalopathy is a generic term for a group of white matter diseases characterized by progressive cerebral deterioration in early life and pathologically by primary absence or degeneration of the myelin of the central and peripheral nervous system with glial reaction. MARJORY SPRAYCAR, STEDMAN'S MEDICAL DICTIONARY 861 (26th ed.1995).

2. Leukoencephalitis is an inflammation of the brain restricted to the white matter. MARJORY SPRAYCAR, STEDMAN'S MEDICAL DICTIONARY 506, 861 (26th ed.1995).

normal EEG." (Tr. 270.). On June 10, 1993, Dr. Renald Bernard described Orr as suffering from grand mal seizures.[3] (Tr. 273.).

On June 30, 1993, Dr. Birgitte Bendixen reported since taking twenty milligrams of Inderal, Orr's headaches "are much improved and now are only occurring once to twice a week and are not severe." (Tr. 283.). Dr. Bendixen also reported in the past week Orr had two seizures which caused her to be incontinent of urine. (Tr. 284.). Orr attributed these seizures to stress. (Tr. 284.). On September 23, 1993, S. Bakker and R.D. Jones, Ph.D., found psychological factors were playing at least some part in Orr's current presentation. (Tr. 298.). Consistent with that idea, they found Orr's headaches and seizures became worse during times of stress. (Tr. 298.). On September 30, 1993, Dr. Sue Lynch Barcellos saw Orr and noted she complained of muscle fatigue and slight incontinence occurring independent of the seizures. (Tr. 291.). On November 2, 1993, Dr. Barcellos noted Orr still complained of muscle fatigue in her thighs. (Tr. 331.). Orr was reporting three to four headaches per week. (Tr. 331.). Orr was also reporting two to four seizures per month where she would lose consciousness for fifteen to thirty minutes. (Tr. 331.). Orr also reported two friends had observed these seizures. (Tr. 331.). On December 17, 1993, Dr. Barcellos noted Orr reported having headaches which lasted six to forty-eight hours and were associated with nausea, vomiting, photophobia, and phonophobia. (Tr. 334.). Orr reported such headaches twenty of the past thirty days. (Tr. 334.). Orr also reported eight seizures where she bit her mouth and was incontinent of urine since her previous visit to Dr. Barcellos. (Tr. 334.).

On December 15, 1993, Dr. Winfield, of the University of Iowa Hospitals and Clinics, reported Orr suffered from incontinence when lifting heavy items, coughing or laughing. (Tr. 337.). On March 14, 1994, Dr. Barcellos reported she believed Orr had "evidence of

meralgia parestheica." [4] (Tr. 341.). On February 25, 1994, Dr. Winfield reported Orr's incontinence problems had improved. (Tr. 342.). On May, 24, 1994, Dr. Barcellos reported Orr suffered six seizures in the past month that usually occurred when Orr had to urinate. (Tr. 345.). Orr also reported continued headache problems—which Dr. Barcellos described as the "most alarming of her current problems"—and occasional bouts of falling down. (Tr. 345.). The headaches had occurred almost daily for the past three weeks. (Tr. 345.). Dr. Barcellos also noted riding in a car prompted Orr to vomit. (Tr. 345.). On September 21, 1994, Dr. Richard Fincham, of the University of Iowa Hospitals and Clinics, reported Orr was suffering from fewer seizures—only two to three a month due to new medication. (Tr. 379.). Orr's headache situation had not changed since her last appointment and she had been forced to visit the hospital for a headache-relieving injection once since then. (Tr. 379.). An MRI showed changes in the T2 mid pons bilaterally. (Tr. 379.).

On May 16, 1994, licensed social worker Tonya Larson reported Orr's physical problems were preventing her from resolving her emotional problems caused by the sexual abuse she suffered as a child. (Tr. 348.). On August 18, 1993, clinical psychologist Norman A. Scott prepared a functional capacity assessment for Orr and found she was "capable of routine, *low* stress independent activities that do not involve [undecipherable] or extended concentration." (Tr. 302.) (emphasis in original). On November 16, 1993, vocational counselor Susan Lieske prepared a report on Orr's employment prospects. (Tr. 318.). Lieske concluded:

> [Orr's] transportation problem now makes it very difficult to get around, so it would be very difficult to get work.... She is likely to have trouble working around others, especially co-workers, so she may need a position where she is working primarily

---

3. Grand mal seizures are a form of epilepsy marked by continuous seizures where the muscles alternately contract and relax. MARJORY SPRAYCAR, STEDMAN'S MEDICAL DICTIONARY 318, 667, 1608 (26th ed.1995).

4. Meralgia paraesthetica is defined as a tingling, formication and itching in the outer side of the lower part of the thigh which may include pain, but where the skin is usually hypesthetic to the touch. MARJORY SPRAYCAR, STEDMAN'S MEDICAL DICTIONARY 946 (26th ed.1995).

on her own. Stress needs to be kept at a minimum, so that also is likely to severely restrict the kind of work she can accept. Claimant needs a vocational evaluation in order to determine what type of work she may be able to go into, so DVRS services are required.

(Tr. 318.). Lieske also noted, "It is doubtful she would be able to work a 40 hour week because of the problems with recovery time from seizures and severe headaches." (Tr. 317.).

### 3. Vocational expert's testimony

Jeff L. Johnson testified as a vocational expert at the administrative hearing. First the ALJ reviewed Johnson's resume and noted Johnson had read Orr's file and been present at the hearing. (Tr. 87–88.). Then, Johnson explained how he makes use of the Dictionary of Occupational Titles (DOT) and other written materials in his job. (Tr. 88–89.). Next, Johnson explained he had prepared a chart describing Orr's past work activity. (Tr. 90.). In his first hypothetical, the ALJ asked Johnson if the person he described would be able to return to their past work. The hypothetical provided:

My first assumption is that we have an individual who is currently 45 years old. She was 42 years old as of the alleged onset date of disability. She is a female. She has a high school education, plus an Associate of Arts degree in general studies, and approximately one more year of college courses. And she has the following impairments: She has a partial, complex, seizure disorder, migraine headaches, medically determinable disorder resulting in leg weakness, major depressive disorder, post-traumatic stress disorder, and mixed personality-disorder. And as a result of a combination of those impairments, she has the physical and mental capacity to perform work-related activities except for lifting 10 pounds, with no standing or walking of more than two hours out of an eight-hour day, with no repetitive squatting, kneeling, crawling, or climbing. This individual should not work or perform work which requires continuous operation of foot controls. She should not work in the presence of heat, humidity, or cold. She should not work at unprotected heights or around hazardous, moving machinery. She is not able to do very complex or technical work, but is able to do more than simple, routing, repetitive work not requiring close attention to detail or use of independent judgment or decision making. She should have no more than occasional contact with the public. She does require occasional supervision and should not work at more than a regular pace using three speeds of pace, being fast, regular, and slow. And she should not work at more than a mild level of stress.

(Tr. 92.).

Johnson testified the ALJ's hypothetical person could not return to her past relevant work. (Tr. 92.). Johnson further testified the ALJ's hypothetical person could perform the job of a companion of which there are 500 jobs in Iowa and 75,000 jobs nationwide. In addition, Johnson testified the hypothetical person could perform the full range, or a wide range, of unskilled light or sedentary work, including such jobs as cashier parking, document preparer for microfilm, office helper, surveillance monitor, and order clerk for food and beverage. (Tr. 92–93.). The ALJ's next hypothetical was the same as his first but contained the additional restriction that the person could lift twenty pounds and lift ten pounds routinely. (Tr. 94.). Johnson testified that hypothetical person could perform the same jobs and ranges of jobs as the first hypothetical person. (Tr. 95.). Orr declined the AL's invitation to question Johnson. (Tr. 95.).

### 4. The ALJ's conclusion

The ALJ reviewed the record and found, "the claimant's subjective complaints of disabling depression, seizures, migraine headaches, and leg weakness not credible." (Tr. 30.). Because he believed Orr could perform work which exists in significant numbers in the national economy, the ALJ concluded Orr was not disabled within the meaning of the Social Security Act. (Tr. 32.). The court will next review its jurisdictional basis for adjudicating this case, and then proceed to analyze the ALJ's decision in light of the record as a

whole and the prevailing case law in the Eighth Circuit.

### C. The Court's Jurisdictional Basis

In *Bowen v. Yuckert,* 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), the United States Supreme Court delineated the steps which precede a district court's review of a Social Security appeal:

The initial disability determination is made by a state agency acting under the authority and supervision of the Secretary. 42 U.S.C. § 421(a), 1383b(a); 20 C.F.R. §§ 404.1503, 416.903 (1986). If the state agency denies the disability claim, the claimant may pursue a three-stage administrative review process. First, the determination is reconsidered de novo by the state agency. §§ 404.909(a), 416.1409(a). Second, the claimant is entitled to a hearing before an administrative law judge (ALJ) within the Bureau of Hearings and Appeals of the Social Security Administration. 42 U.S.C. §§ 405(b)(1), 1383(c)(1) (1982 ed. and Supp. III); 20 C.F.R. §§ 404.929, 416.1429, 422.201 et seq. (1986). Third, the claimant may seek review by the Appeals Council. 20 C.F.R. §§ 404.967 et seq., 416.1467 et seq. (1986). Once the claimant has exhausted these administrative remedies, he may seek review in federal district court.

*Yuckert,* 482 U.S. at 142, 107 S.Ct. at 2291.

Section 1383(c)(3) of Title 42 of the United States Code provides, "The final determination of the Secretary after a hearing ... shall be subject to judicial review as provided in section 405(g) of this title...." In pertinent part, 42 U.S.C. § 405(g) provides:

Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia.... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.... The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions....

42 U.S.C. § 405(g) (Supp.1995). The gist of the preceding analysis is that the court may affirm, reverse or remand the ALJ's decision.

## II. ANALYSIS

### A. The "Substantial Evidence" Standard

The Eighth Circuit's standard of review in Social Security cases is abundantly documented and oft repeated. If supported by substantial evidence in the record as a whole, the Secretary's findings are conclusive and must be affirmed. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996); *Smith v. Shalala,* 31 F.3d 715, 717 (8th Cir.1994) (citing *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); 42 U.S.C. § 405(g) (Supp.1995)). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" *Roe v. Chater,* 92 F.3d 672, 675 (8th Cir.1996) (quoting *Oberst v. Shalala,* 2 F.3d 249, 250 (8th Cir.1993)). Or, in the words of the Supreme Court, substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (citing *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

The Eighth Circuit has taken pains to emphasize that, "A notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'"

*Wilson v. Sullivan,* 886 F.2d 172, 175 (8th Cir.1989) (quoting *Jackson v. Bowen,* 873 F.2d 1111, 1113 (8th Cir.1989)). Substantial evidence on the record as a whole requires the court to "take into account whatever in the record fairly detracts from [the] weight" of the administrative decision, consider the weight of the evidence in the record, and "apply a balancing test to evidence which is contradictory." *Id.* Put simply, in reviewing the decision below, the court must "encompass[ ] evidence that detracts from the decision as well as evidence that supports it." *Andler v. Chater,* 100 F.3d 1389, 1392 (8th Cir.1996) (citing *Comstock v. Chater,* 91 F.3d 1143, 1145 (8th Cir.1996)). The court, however, does " 'not reweigh the evidence or review the factual record de novo.' " *Roe,* 92 F.3d at 675 (quoting *Naber v. Shalala,* 22 F.3d 186, 188 (8th Cir.1994)). Likewise, it is not the court's task to review the evidence and make an independent decision. *Ostronski v. Chater,* 94 F.3d 413 (8th Cir.1996) (citing *Mapes v. Chater,* 82 F.3d 259, 262 (8th Cir.1996)). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the denial of benefits. *Id.* In other words, this court "may not reverse merely because substantial evidence exists for the opposite decision." *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citing *Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir.1993)). Even in the case where this court "might have weighed the evidence differently, [it] may not reverse the Commissioner's decision when there is enough evidence in the record to support either outcome." *Culbertson v. Shalala,* 30 F.3d 934, 939 (8th Cir.1994) (citing *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir.1992)).

Lest one be misled into believing the process is stacked in the Commissioner's favor, bear in mind that, "The standard requires a scrutinizing analysis, not merely a 'rubber stamp' of the [Commissioner]'s action." *Cooper v. Secretary,* 919 F.2d 1317, 1320 (8th Cir.1990) (citing *Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir.1989)). In cases where the Commissioner's position is not supported by substantial evidence in the record as a whole, the court must reverse. *See*

*Lannie v. Shalala,* 51 F.3d 160, 164 (8th Cir.1995). In those cases where a full and fair record does not exist, the court must remand to the Commissioner. *See Highfill v. Bowen,* 832 F.2d 112, 115 (8th Cir.1987) (citing *Kane v. Heckler,* 731 F.2d 1216, 1219 (5th Cir.1984), and *Dorsey v. Heckler,* 702 F.2d 597, 605 (5th Cir.1983)). Remand is not appropriate, however, if it would merely delay benefits. *Andler v. Chater,* 100 F.3d 1389, 1394 (8th Cir.1996) (citing *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir.1984)). " 'If the record presented to the ALJ contains substantial evidence supporting a finding of disability, a reviewing court may reverse and remand the case to the district court for entry of an order granting benefits to the claimant.' " *Id.* (quoting *Parsons,* 739 F.2d at 1341). *See also Lynn v. Bowen,* 702 F.Supp. 768, 774 (W.D.Mo.1988) (citing *Parsons,* 739 F.2d at 1341).

It is also important to consider the ALJ's " 'duty to fully and fairly develop the record even if ... the claimant is represented by counsel.' " *Battles v. Shalala,* 36 F.3d 43, 44 (8th Cir.1994) (quoting *Boyd v. Sullivan,* 960 F.2d 733, 736 (8th Cir.1992)). This duty exists to insure " 'a just determination of disability.... Claimants, especially those not represented by counsel, can hardly be expected to be familiar with the intricacies of the Secretary's Guidelines.' " *Clark v. Shalala,* 28 F.3d 828, 830 (quoting *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982) (en banc)). " '[T]he goals of the Secretary and the advocates should be the same: that deserving claimants who apply for benefits receive justice.' " *Battles v. Shalala,* 36 F.3d 43, 44 (8th Cir.1994) (quoting *Sears v. Bowen,* 840 F.2d 394, 402 (7th Cir.1988)).

## B. *The Polaski Standard and Subjective Pain Credibility Determinations*

The seminal case for evaluating a claimant's subjective complaints of pain in Social Security cases is *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir.1984) (*supplemented,* 751 F.2d 943 (8th Cir.1984), *vacated,* 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974, *adhered to on remand,* 804 F.2d 456 (8th Cir.1986), *cert. denied,* 482 U.S. 927, 107 S.Ct. 3211, 96

L.Ed.2d 698 (1987)). In *Polaski*, the Eighth Circuit held:

> The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosages, effectiveness and side effects of medication;
> 5. functional restrictions.

> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski*, 739 F.2d at 1322.

To conduct the proper *Polaski* analysis, "Merely quoting *Polaski* is not good enough, especially when an ALJ rejects a claimant's subjective complaints of pain." *Hall v. Chater*, 62 F.3d 220, 223 (8th Cir.1995). Instead, "*Polaski* requires that an ALJ give full consideration to all of the evidence presented relating to subjective complaints." *Ramey v. Shalala*, 26 F.3d 58, 59 (8th Cir.1994). To that end, "When making a determination based on these factors to reject an individual's complaints, the ALJ must make an express credibility finding and give his reasons for discrediting the testimony." *Shelton v. Chater*, 87 F.3d 992, 995 (8th Cir.1996) (citing *Hall v. Chater*, 62 F.3d 220, 223 (8th Cir. 1995)). Such a finding is required to demonstrate the ALJ considered and evaluated all of the relevant evidence. *See Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir.1995) (citing *Ricketts v. Secretary of Health and Human Servs.*, 902 F.2d 661, 664 (8th Cir. 1990)). However, if "the ALJ did not explicitly discuss each *Polaski* factor in a methodical fashion," but "acknowledged and considered those factors before discounting [the claimant's] subjective complaints of pain.... An arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where ... the deficiency probably had no practical effect on the outcome of the case." *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir.1996) (citing *Benskin v. Bowen*, 830 F.2d 878, 883 (8th Cir.1987)).

### C. Relative Burdens of Proof

To be awarded disability benefits, a person must be legally disabled. The Social Security Act defines "disability" as

> the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months....

42 U.S.C. § 423(d)(1)(A) (1994). An impairment will only be considered of such severity if the individual is

> not only unable to do his previous work but cannot, considering ... [his] age, education and work experience, engage in any other kind of substantial gainful work which exists in [significant numbers in] the national economy ... either in the region in which such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2) (1994). To simplify these definitions, Code drafters developed a sequential evaluation process to analyze disability claims:

(1) Is the claimant currently engaged in substantial gainful activity? If "Yes," the claim is denied. If "No," go to Step 2.

(2) Is the claimant's medical impairment or combination of impairments severe enough that it significantly limits phys-

ical or mental ability to do basic work activities? If "Yes," go to Step 3. If "No," the claim is denied.

(3) Does the claimant have an impairment or combination of impairments which meets or equals the duration requirement and is contained in the listing of impairments? If "Yes," the claim is approved. If "No," go to Step 4.

(4) Does the claimant have an impairment or combination of impairments which prevents past relevant work? If "Yes," go to Step 5. If "No," the claim is denied.

(5) Can the claimant, given his residual functional capacity and his age, education and past work experience perform any other work which exists in substantial numbers in the national economy? If "Yes," claim is denied. If "No," claim is approved.

See 20 C.F.R. § 404.1520(a)-(f)(1) (1994); *Williams v. Sullivan*, 960 F.2d 86, 88 (8th Cir.1992).

The claimant bears the burden of making a prima facie case of disability, which includes proof of no substantial gainful activity under Step 1 and proof of severity under Step 2. *See* 20 C.F.R. § 404.1512(c) (1994); *Williams*, 960 F.2d at 88. At Step 3, it is the job of a medical or psychological consultant employed by the Social Security Administration to determine whether a claimant's impairments meet or equal a listing. 20 C.F.R. § 404.1526(b) (1994), *see also Cruze*, 85 F.3d at 1322. At Step 4, the claimant has the burden of proving that he cannot return to his past relevant work. *See Baumgarten v. Chater*, 75 F.3d 366, 368 (8th Cir.1996) (citing *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir.1992)). If the claimant meets his burden of proof at Step 4, the burden shifts to the Commissioner to establish the claimant's ability to perform other work in Step 5. *Id.*

### D. . Review Of The ALJ's Decision

In this case, Orr contends there are two issues, both of which are intimately connected to her subjective complaints of pain about her recurring headaches and seizures, and the ALJ's decision to discount those com-

plaints. Specifically, Orr argues the ALJ's decision to ignore her complaints of pain was not supported on the record as a whole. In the order, the ALJ wrote, "Having considered the entire evidence of record, the undersigned finds the claimant's subjective complaints of disabling depression, seizures, migraine headaches, and leg weakness not credible." (Tr. 30.). As a consequence of discounting her subjective complaints of pain, Orr argues when the ALJ formulated the hypothetical he posed to the vocational expert, he failed to include limitations on her ability to concentrate and maintain attention which, if included, would have shown she was incapable of performing work in a competitive environment. Orr argues these limitations are documented by evidence in the form of records from her clinical psychologist, mental health counselor and vocational counselor.

### 1. Orr's subjective pain complaints— the Polaski analysis

Orr claims the pain from her headaches renders her unable to concentrate and maintain attention on a consistent enough basis to maintain competitive employment. Orr argues the ALJ ignored these complaints of pain when conducting his *Polaski* analysis. The court has previously laid out the *Polaski* analysis in detail. Briefly, *Polaski* requires the court to review the evidence of the claimant's prior work record, observations by third parties, and observations of treating and examining physicians and consider how that evidence relates to such matters as:

1. the claimant's daily activities;

2. the duration, frequency and intensity of the pain;

3. precipitating and aggravating factors;

4. dosages, effectiveness and side effects of medication;

5. functional restrictions.

*Polaski*, 739 F.2d at 1322. In this case, the court must determine if the ALJ based his decision to discount Orr's subjective complaints of pain from her headaches and seizures on substantial evidence in the record as a whole. The court now conducts its analysis.

### a. Observations by treating and examining physicians

■ None of the twelve doctors who examined Orr or reviewed her test results questioned Orr's subjective complaints of pain. These doctors included Drs. Hizon, Landhuis, Lacey, Raval, Kimelman, DeHaan, Pun, Bernard, Bendixen, Barcellos, Winfield and Fincham. The only negative comments in the 400–page record came from Dr. Hizon who reported Orr was "manipulative" and "demanding" and sought special privileges during one of her extended stays in the hospital. (Tr. 195.). Dr. Hizon also believed Orr told people what they wanted to hear and played games with the staff. (Tr. 195.). Although these comments do not reflect well on Orr's attitude as a patient, neither do they explicitly or implicitly question her subjective complaints of pain. Moreover, on the same day she made the negative comments, Dr. Hizon wrote Orr was not ready to return to her previous job. (Tr. 195.). These isolated negative comments do not indicate Orr was not experiencing the pain she alleged she experienced.

In contrast, the other reports from Orr's doctors show they took Orr's subjective complaints of pain quite seriously. Dr. Raval took Orr's complaints seriously enough to order her not to drive until she had been free of seizures for six months as per Iowa law. (Tr. 232.). Dr. Kimelman found Orr's back problems serious enough to place her on a light duty work restriction with a twenty-five pound lifting restriction. (Tr. 238.). Dr. E.D. DeHaan found Orr's headache complaints credible enough to prescribe an injection of Compazine and Restoril to alleviate her pain. (Tr. 252.). Dr. Pun took Orr's complaints seriously enough to order an MRI, the results of which were abnormal and tended to show either multiple sclerosis or lacunar infarction. (Tr. 268.). Dr. Raval found Orr's complaints serious enough to report it likely Orr suffered from partial complex seizures. (Tr. 270.). Dr. Renald Bernard found Orr's complaints serious enough to report Orr suffered from grand mal seizures. (Tr. 273.). Dr. Barcellos took Orr's complaints seriously enough to describe Orr's headaches as the "most alarming of her current problems." (Tr. 345.). In other words, the great weight of the evidence on the record as a whole shows all of Orr's doctors took Orr's subjective complaints of pain extremely seriously.

### b. Observations of third parties

The record contained few observations of Orr by third parties other than medical doctors. Orr's daughter, Denise, testified she sees her mother once a week, and in her experience, Karen's testimony at the administrative hearing was accurate. (Tr. 86.). Specifically, Denise testified her mother "sleeps all the time" and "is always tired, always got a headache, cranky." (Tr. 86.). Denise also testified the day after a seizure her mother is "dopey" the entire day, and, because of the seizures, Denise no longer trusts her mother to care for her daughter. (Tr. 86–87.).

Licensed social worker Tonya Larson found Orr's physical problems credible enough to comment they prevented her from resolving her emotional problems that stemmed from sexual abuse. (Tr. 348.). Clinical psychologist Norman A. Scott found Orr's physical problems limited her to "*low stress independent activities*" that did not require "extended concentration." (Tr. 302.) (emphasis in original). Vocational counselor Susan Lieske found Orr's physical problems would make it very difficult to get work and cause her trouble working around co-workers. (Tr. 317). Lieske believed Orr's low tolerance for stress would severely restrict the type of work Orr could accept, and her recovery time from seizures and headaches would prevent her from working a forty-hour work week. (Tr. 317, 318.). S. Bakker and R.D. Jones, Ph.D. found psychological factors played some part in Orr's health problems and found Orr's headaches and seizures grew worse during times of stress. (Tr. 298.). This third-party testimony is as supportive of Orr's subjective complaints of pain as is the evidence from Orr's treating and examining physicians.

### c. Orr's prior work record

Orr's prior work record reveals she has held a number of unskilled and semi-skilled

jobs. For example, Orr worked as a certified nurse's aid in a nursing home (Tr. 68.), a supervisor at a sheltered workshop, (Tr. 69–71.), a registered care technician (RCT) from 1985–87, (Tr. 71.), and a military dining hall food service worker. (Tr. 72.). Orr left her job as a CNA in July 1993, just as her medical problems took a turn for the worse. (Tr. 68.).

#### d. Analyzing the evidence in light of the Polaski factors

Having reviewed the whole of the medical evidence, the third-party observation evidence, and the prior work history evidence, the court analyzes this evidence in light of the five factors established in *Polaski*. The first *Polaski* factor to consider is the claimant's daily activities. As mentioned, in a typical day Orr wakes up between 3:00 a.m. and 8:00 a.m., showers by herself, eats breakfast, reads and watches television (but has trouble concentrating on either activity), visits two elderly ladies in her building, eats lunch, watches soap operas, naps, eats dinner, watches television, tries to work crosswords or jigsaw puzzles. (Tr. 81–84.). Occasionally, Orr takes part in her community theater, although she is much less involved with the troupe than she once was. (Tr. 85.).

■ In his analysis of Orr's daily activities, the ALJ discounted Denise Orr's testimony because she only sees her mother once a week. (Tr. 30.). He found Orr's testimony that she can perform household chores, read, watch TV and visit neighbors indicative of her ability to work. The court disagrees and finds the activities in which Orr participated are in no way out of line with the evidence discussed above and do not detract from Orr's subjective complaints of pain. Orr's problem is that she suffers from frequent but unpredictable seizures and headaches. The court is not surprised that, on her infrequent good days, Orr is capable of working a crossword puzzle. One can always quit working a puzzle if unable to concentrate, the same cannot be said for a job in the competitive workday world. The medical evidence also showed Orr's daily activities do not include driving a car because she was forbidden to do so by Dr. Raval. (Tr. 232.). In the United States today, especially for a woman in a rural Iowa town, this restriction would have a devastating effect on Orr's ability to find a job.

■ The second *Polaski* factor to consider is the duration, frequency and intensity of the pain the claimant suffers. The most recent medical reports showed Orr suffers from two or three seizures a month (Tr. 379.), and almost constant headaches for which she still received injections. (Tr. 345.). Orr's daughter reported the seizures rendered her incapable of working the next day. (Tr. 86–87.). The vocational expert found Orr's physical problems severely limited the type of work she could do and prevented her from working a forty-hour work week. (Tr. 317–318.). In his analysis of the duration, frequency and intensity of the pain Orr suffers, the ALJ acknowledged Orr suffers from recurring seizures and headaches but he reached no conclusions as to how those afflictions affect her ability to work. This is a serious oversight on the ALJ's part. The second *Polaski* factor in the one which offers the greatest support for finding Orr is disabled. Orr suffers headaches on a regular basis and seizures on an irregular basis. The seizures last for only fifteen to thirty minutes, but their effects continue into the next day. The prospect of having to attend work every day under these conditions is daunting at best. The evidence relating to the duration, frequency and intensity of the pain Orr suffers supports Orr's allegations and tends to make Orr's subjective complaints that her pain is disabling more credible than less.

■ The third *Polaski* factor is the precipitating and aggravating factors of the claimant's subjective complaints of pain. The medical evidence, according to Dr. Barcellos, showed stress was a contributing factor to Orr's seizures. (Tr. 284.). An evaluation by Bakker and Jones reached the same conclusion. (Tr. 298.). The only reference the ALJ makes to precipitating factors is when he mentions stress tends to aggravate Orr's condition. (Tr. 29.). This, of course, agrees with Barcellos, Bakker and Jones' conclusion. From that finding, the ALJ appears to conclude Orr's problems are more psychological

than physical and, therefore, are not disabling. The court reaches a different conclusion. It is undisputed Orr suffers from headaches and seizures. Obviously, taking a job that requires her to work eight hours a day, five days a week would be extremely stressful for Orr. If work places Orr at a greater risk for seizures and headaches, this court's concern is that those physical consequences will make it impossible to perform her job. It is immaterial whether there are psychological roots to Orr's physical problems. The precipitating-and-aggravating-factors evidence supports and makes more credible Orr's subjective complaints of disabling pain.

■ The fourth *Polaski* factor is the dosages, effectiveness and side effects of medication. The record is replete with evidence of Orr's doctors experimenting with different combinations of drugs in an attempt to control her seizures and headaches. Some of these combinations worked better than others, and whatever the results, helpful or harmful, Orr reported them to her physicians as is noted in their records. The most recent reports show Orr's seizures have been contained somewhat, but her headaches continue unabated. The ALJ concluded Orr had taken a number of medications, but "they have not been taken on a chronic and/or high dosage basis which would indicate continuing severe difficulties." (Tr. 29.). The court finds this statement simply unsupported by the evidence. Orr has taken medication constantly—the definition of chronic—since it was first prescribed for her and had varying degrees of success. If a claimant takes all the medication which she is prescribed, and does so for a number of years and yet continues to have severe medical problems, such events only further validate the claimant's subjective complaints of pain.

■ The fifth and final *Polaski* factor is the functional restrictions placed on the claimant. In this case, Orr is limited to lifting twenty-five pounds because of her back problems. (Tr. 238.). She is also not allowed to drive a car due to her seizures. (Tr. 232.). Due to her physical problems, Orr is also limited to low stress independent activities not requiring extended concentration, (Tr. 302.), and probably cannot work a

forty-hour week. (Tr. 317, 318.). The ALJ inexplicably made no reference to these functional restrictions in his opinion. Clearly, the doctors and other professionals who evaluated Orr would not have restricted Orr's ability to work if they did not believe there were sound reasons for doing so. The evidence relating to Orr's restrictions, the fifth *Polaski* factor, lends credence to her subjective complaints of disabling pain, just as do the first four *Polaski* factors.

■ After reviewing the evidence on the record as a whole, the court concludes the evidence of observations by treating and examining physicians, observations by third parties, and prior work record as they relate to daily activities; the duration, frequency and intensity of pain; the precipitating and aggravating factors; the dosages, effectiveness and side effects of medication; and functional restrictions; all lend credence to Orr's subjective complaints of pain. Furthermore, there is little, if any, evidence which fairly detracts from the credibility of Orr's complaints. For this reason, the court concludes when the ALJ wrote, "Having considered the entire evidence of record, the undersigned finds the claimant's subjective complaints of disabling depression, seizures, migraine headaches, and leg weakness not credible," (Tr. 30.), his decision was not supported by substantial evidence on the record as a whole. When the court considers the issue of which restrictions should have been included in the hypothetical, it will include restrictions which are consequences of Orr's subjective complaints of pain.

### 2. The ALJ's hypothetical

"The point of the hypothetical question is to clearly present to the VE [vocational expert] a set of limitations that mirror those of the claimant." *Roe*, 92 F.3d at 676 (citing *Hogg v. Shalala*, 45 F.3d 276, 279 (8th Cir. 1995)). Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question. *Pickney*, 96 F.3d at 296 (citing *Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir.1996)). When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not

constitute substantial evidence. *Id.* (citing *Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994)). This is because, "[a] vocational expert cannot be assumed to remember all of a claimant's impairments from the record." *Newton v. Chater,* 92 F.3d 688, 694 (8th Cir.1996) (citing *Whitmore v. Bowen,* 785 F.2d 262, 263–64 (8th Cir.1986)). For this reason, "[T]he ALJ must set forth all of the claimant's disabilities when posing a hypothetical question to the VE." *Ostronski,* 94 F.3d at 420 (citing *Greene v. Sullivan,* 923 F.2d 99, 101 (8th Cir.1991)). However, "all" of the claimant's disabilities " 'include only those impairments that the ALJ finds are substantially supported by the record as a whole.' " *Roe,* 92 F.3d at 675 (quoting *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993)). That is to say, "[T]he hypothetical is sufficient if it sets forth the impairments that *the* ALJ has found the claimant to have." *Ostronski,* 94 F.3d at 420 (emphasis added) (citing *Rappoport v. Sullivan,* 942 F.2d 1320, 1323 (8th Cir.1991)). Along those lines, "[T]he ALJ need not include every physiological impairment suggested by the evidence." *Id.* (citing *Roberts v. Heckler,* 783 F.2d 110, 112 (8th Cir.1985)). On the other hand, "[A] hypothetical question based solely upon the ALJ's assumptions, without medical corroboration, is devoid of usefulness or meaning." *Morse v. Shalala,* 16 F.3d 865, 874 (8th Cir. 1994) (citing *Mitchell v. Sullivan,* 925 F.2d 247, 249–50 (8th Cir.1991)). Even so, if the ALJ's hypothetical is different, but not materially different from the restrictions described by the doctor, there is no error. *See Miller v. Shalala,* 8 F.3d 611, 614 (8th Cir. 1993). Also, a hypothetical need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments. *Roe,* 92 F.3d at 676.

As mentioned earlier, the ALJ's first hypothetical provided:

My first assumption is that we have an individual who is currently 45 years old. She was 42 years old as of the alleged onset date of disability. She is a female. She has a high school education, plus an Associate of Arts degree in general studies, and approximately one more year of college courses. And she has the following impairments: She has a partial, complex, seizure disorder, migraine headaches, medically determinable disorder resulting in leg weakness, major depressive disorder, post-traumatic stress disorder, and mixed personality-disorder. And as a result of a combination of those impairments, she has the physical and mental capacity to perform work-related activities except for lifting 10 pounds, with no standing or walking of more than two hours out of an eight-hour day, with no repetitive squatting, kneeling, crawling, or climbing. This individual should not work or perform work which requires continuous operation of foot controls. She should not work in the presence of heat, humidity, or cold. She should not work at unprotected heights or around hazardous, moving machinery. She is not able to do very complex or technical work, but is able to do more than simple, routing, repetitive work not requiring close attention to detail or use of independent judgment or decision making. She should have no more than occasional contact with the public. She does require occasional supervision and should not work at more than a regular pace using three speeds of pace, being fast, regular, and slow. And she should not work at more than a mild level of stress.

(Tr. 92.). The second hypothetical was the same as the first, but included a twenty-pound lifting restriction. (Tr. 94.).

■ For reasons explained above, the hypothetical should also have made mention of Orr's seizures, the after-effects of the seizures, and the pain associated with Orr's persistent headaches. A proper hypothetical would have included these additional restrictions:

Assume the individual suffers from anywhere from two to eight seizures each month, although usually closer to two than eight. These seizures last from fifteen to thirty minutes and cause the individual to be incontinent of urine. The frequency of seizures is increased by stress. After the seizures, the individual's muscles are extremely sore, and in colloquial terms, she feels as if she has just been hit by a truck.

Also, post-seizure days are often associated with terrible headaches which make the individual "groggy" and desirous of sleeping all day. These seizures are severe enough that physicians have prescribed anti-convulsant medication.

In addition to the seizures, the individual also suffers from severe headaches which occur between one out of two and two out of three days per week. Often these headaches occur post-seizure, but they also occur independent of seizures. Occasionally, these headaches are of such a severe nature the individual is forced to visit a hospital emergency room where she receives a drug injection designed to block the headache pain. The individual also takes medicine daily to ward off headaches.

The court is convinced these additional restrictions would have affected the vocational expert's decision and caused him to conclude there were no jobs in the national economy which Orr could perform. Unlike some clear cut Social Security cases, this is not one where the claimant cannot possibly go to work at all. The court has no doubt that during the better parts of her better days, Orr could perform a number of light-activity, low-stress jobs. The more pertinent question is whether Orr could handle these type of jobs for eight hours a day, five days a week, fifty weeks a year.

■ In that sense, the facts in the case at hand strongly resemble those in *Thompson v. Sullivan*, 928 F.2d 276 (8th Cir.1991). In *Thompson*, the claimant was employed as a home health aide to a quadriplegic with whom he spent approximately five to six hours daily, assisting him with dressing, cleaning and praying. *Id.* at 277. As the Eighth Circuit recounted,

Thompson suffered from major seizure disorders, manifested by grand mal and partially complex seizures. The seizures occurred as frequently as twice a month. During the seizures appellant lost consciousness, became violent, and/or was delirious. He had been known to attack others during a seizure. He also suffered from generalized anxiety disorder characterized by high tension levels, violence, and extreme agitation. Apparently, medication

was not effective for any of his impairments. As his employment continued, it became more difficult for Thompson to complete his duties due to the increased frequency and intensity of the seizures.

*Id.* Thompson required frequent rest periods and often missed days (and sometimes weeks) from work, but was paid regardless of the actual work he performed. *Id.* at 278. The Eighth Circuit described this situation as more akin to charity than payment for services and held that Thompson had not been engaged in substantial gainful activity. *Id.* The court believes such would be the case in any job Orr could find, i.e., she might be able to keep her employment, but it would be due only to a charitable act of her employer. Due to her headaches and seizures, Orr is not capable of showing up for work day in and day out. On those days she could work, no employer could rely on her for a full day's work or for high quality work because of Orr's concentration problems resulting from her headaches. The court concludes if the AL's hypothetical had included all of the restrictions fairly drawn from the evidence in the record on a whole, the vocational expert would have concluded there are no jobs in the national economy which Orr could satisfactorily perform.

### III. CONCLUSION

■ Based on the evidence in the record on a whole, the court is convinced the ALJ improperly discounted Orr's subjective complaints of pain resulting from her constant headaches and her intermittent seizures contrary to the dictates of the Eighth Circuit as described in *Polaski*. Orr's complaints of pain are supported by the evidence on the record as a whole. The ALJ was particularly in error to conclude the duration, frequency and intensity of pain Orr's suffers do not have a profound negative effect of her ability to work. The ALJ was also in error not to recognize that increased levels of stress precipitate Orr's headaches and seizures, that Orr's inability to drive a car would severely restrict her ability to work, and that Orr takes large dosages of medicine on a chronic basis. When Orr's complaints of pain, as documented by the above mentioned facts,

are afforded their rightful weight, the hypothetical posed to the vocational expert must include additional restrictions. Those additional restrictions would require the vocational expert to consider the effect that suffering from two to eight seizures per month (which last for fifteen minutes and cause her to be incontinent or urine and to feel "groggy" the next day) would have on Orr's ability to work. Those restrictions would also require the vocational expert to consider the effect that suffering from headaches one out of two, or two out of every three days would have on Orr's ability to work. The vocational expert, if questioned about the new hypothetical would conclude there are no jobs in the national economy which Orr can perform. Given this opinion, the ALJ would reach the fifth step of the benefits granting process and determine Orr is disabled within the meaning of the Social Security statutes. This conclusion is strongly supported by *Thompson v. Sullivan*, 928 F.2d 276 (8th Cir.1991), where the Eighth Circuit held that a gentleman who suffered seizures with approximately the same frequency and of approximately the same severity as does Orr was disabled. In this case, where the evidence on the record as a whole is clearly indicative of disability and additional hearings serve no purpose other than to delay the inevitable receipt of benefits, remand is inappropriate and an immediate order granting benefits is justified. *See Andler*, 100 F.3d at 1394; *Cline v. Sullivan*, 939 F.2d 560, 569 (8th Cir.1991) ("[W]here the total record convincingly establishes disability and further hearings would merely delay receipt of benefits, an immediate order granting benefits without remand is appropriate."). For these reasons, the Court concludes there is substantial evidence on the record as a whole supporting a finding that Orr is disabled and, therefore, entitled to Supplemental Security benefits and disability benefits. Therefore, judgment shall be entered reversing the ALJ's decision.

**IT IS SO ORDERED.**