Dawn D. COMSTOCK, Plaintiff,

v.

Michael J. ASTRUE, Commissioner
of Social Security, Defendant.

No. C12–4013–LTS.

United States District Court,
N.D. Iowa,
Western Division.

Feb. 14, 2013.

Wilford L. Forker, Sioux City, IA, for Plaintiff.

Stephanie Johnson Wright, U.S. Attorney's Office, Northern District of Iowa ECF, Cedar Rapids, IA, for Defendant.

**ORDER**

LEONARD T. STRAND, United States Magistrate Judge.

### Introduction

Plaintiff Dawn Comstock seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act, 42 U.S.C. § 1383(c)(3). Com-

stock contends the administrative record ("AR") does not contain substantial evidence to support the Commissioner's decision that she is not disabled.

### Background

Comstock was born in 1968 and completed school up to ninth grade. AR 33, 144. She previously worked as a cashier, change person, cocktail waitress, fast food worker, and telephone solicitor. AR 250–55. Comstock protectively filed for SSI on August 8, 2008, alleging disability beginning on January 1, 2007,[1] due to migraine headaches, psychological problems, and fibromyalgia. AR 158, 163. Her claims were denied initially and on reconsideration. AR 74–77, 86–89. Comstock requested a hearing before an Administrative Law Judge ("ALJ"). AR 95. On October 27, 2010, ALJ Jan E. Dutton held a hearing via video conference during which Comstock and a vocational expert ("VE") testified. AR 25–53.

On December 1, 2010, the ALJ issued a decision finding Comstock not disabled since August 8, 2008. AR 10–19. Comstock sought review of this decision by the Appeals Council, which denied review on January 13, 2012. AR 1–3. The ALJ's decision thus became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

On January 31, 2012, Comstock filed a complaint in this court seeking review of the ALJ's decision. On February 27, 2012, with the parties' consent, United States District Judge Mark W. Bennett transferred the case to then-Chief United States Magistrate Judge Paul A. Zoss for final disposition and entry of judgment. On June 8, 2012, the case was reassigned to me. The parties have briefed the issues and the matter is now fully submitted.

### Summary of Evidence

I have reviewed the entire record. The following is a summary of the evidence relevant to Comstock's claim:

### A. Medical Evidence

In March 2008, Comstock saw Maria Tudor, M.D., for a comprehensive medical examination. AR 267–68. She complained of joint pain that started in her hands and developed into her knees, wrists, hips, ankles, toes, shoulders and elbows. *Id.* She said it was continuous and sometimes interfered with her sleep. *Id.* She was given a trial course of steroids and other medication. Follow-up tests were also ordered. *Id.* Two weeks later, Comstock was not experiencing any relief of her symptoms. AR 263. Dr. Tudor explained that fibromyalgia is a chronic problem that will have good days and bad days. She gave Comstock new medication and told her to follow up in two to three weeks. *Id.*

In September 2008, Comstock saw Susan Vigdal, ARNP, for her fibromyalgia pain. AR 304. Vigdal noted Comstock had also developed some confusion from the fibromyalgia. Comstock said she had quit taking her medication because she could not afford it. Vigdal referred her to Dr. Wisco, a specialist. *Id.*

Robert Wisco, M.D., is Comstock's most recent treating physician for her fibromyalgia. AR 347. He began seeing her on January 14, 2009, for a rheumatologic consultation and an assessment of her musculoskeletal problems. *Id.* Dr. Wisco went over her past medical history and Comstock reported that her headaches were much better than they had been in the past. *Id.* Dr. Wisco thought that her symptoms were most consistent with fibro-

---

**1.** Comstock changed her alleged onset date to August 8, 2008, during the administrative hearing on October 27, 2010. AR 30.

myalgia. He recommended that she begin a regular exercise program and prescribed gabapentin. AR 349.

As for her mental impairments, Comstock has seen Karen Stoos, ARNP, at Siouxland Mental Health Center since March 2007 for depression, anxiety and insomnia. AR 282–83. Ms. Stoos diagnosed Comstock with major depressive disorder and prescribed an anti-depressant. *Id.* At an appointment in May 2008, Comstock mentioned she stopped taking her medication the previous year because she thought she would be fine without it. AR 297. She also told Ms. Stoos that she had worked at Hardee's for a couple of months but was asked to leave because she was crying daily. *Id.* She then went back to a previous telemarketing job but only lasted a few weeks because she was crying daily. *Id.* Comstock told Ms. Stoos that she had been taking Cymbalta since January for her fibromyalgia and depression and that it was working well. *Id.*

Comstock began seeing Jennifer Crew, a licensed social worker, at Siouxland Mental Health on August 4, 2008. AR 387. Comstock stated she had stopped taking the medication prescribed by Ms. Stoos because she had concerns about her blood sugar being low. *Id.* Comstock did not start taking her medication again until October 2008. AR 392. Comstock primarily discussed her difficulties with fibromyalgia pain and depression with Ms. Crew. On December 23, 2009, Ms. Crew noted that Comstock had been admitted to the hospital on December 20th after she had made cuts along her stomach and upper leg. AR 525. She was released the next day. *Id.* At this appointment, Comstock said she had not been taking her medication. *Id.*

Comstock was admitted to the hospital on August 30, 2010, for chest pain and was found to have myocardial infarction. AR 584. She underwent cardiac catheterization and three stents were placed. AR 586, 803. Her discharge instructions noted that she was limited to light activity and no heavy lifting or straining for 48 hours. AR 806. Comstock experienced groin pain for five or six days after her surgery and went to the emergency room to have it evaluated. AR 588. A CT scan revealed a moderate retroperitoneal hematoma and she was admitted for further evaluation. AR 588. She was transferred to ICU at Mercy Medical Center for further testing. AR 611. She was diagnosed with retroperitoneal bleed and discharged on September 8, 2010, with medications and instructions to follow-up with her primary care provider for hemoglobin checks. AR 656.

Following her hospitalizations, Comstock often discussed her health concerns with Ms. Crew. In October 2010, she found out she had high cholesterol. AR 1067. Comstock told Ms. Crew she was working on exercising and walking six blocks each day. *Id.* However, Comstock said her pain level had significantly increased and her doctor had prescribed stronger medication to be used for the worst pain episodes. *Id.*

### B. Consultative Examinations

Douglas Martin, M.D., performed a physical consultative examination on October 7, 2008. AR 305–11. Comstock explained that she had a two-to-three-year history of widespread muscle and joint pain and that a physician had told her in January 2008 that she might have both fibromyalgia and rheumatoid arthritis. AR 305. Comstock also told Dr. Martin that she was being treated with a combination of anti-depressants and Lyrica for her condition. *Id.* In his assessment, Dr. Martin noted that he could not confirm the diagnosis of fibromyalgia but that it seemed inconsistent with a diagnosis of rheumatoid arthritis. He wrote, "perhaps her physical complaints are somatic man-

ifestations of an underlying psychiatric or psychological problem" and found that Comstock likely suffered from depression. AR 307. His recommendations were as follows:

> With respect to this lady's remaining functional capabilities, I think her psychiatric status needs to be further investigated and treated concerning her problems. Having said that, I am, obviously, going to leave any psychiatric or psychological opinions regarding possible limitations of her activities of daily living to those professionals better able to comment on such.
>
> From a purely physical standpoint, I can not find an organic basis today or physical examination abnormality to really limit her.
>
> Concerning issues with respect to lifting and carrying, I would expect her to be able to perform somewhere between 30 and 35 pounds occasionally, 15 to 20 pounds frequently, and 5 to 10 pounds constantly.
>
> Concerning standing, moving about, walking or sitting, I would have no particular concerns.
>
> Concerning stooping, climbing, kneeling and crawling activities, I would have no particular concerns.
>
> Concerning handling objects, seeing, hearing, speaking and traveling, or with issues concerning exposures to the work environment, such as to dust, fumes, temperatures or hazards, I would have no particular concerns.

AR 308.

Michael Baker, Ph.D., performed a mental consultative examination on October 7, 2008. AR 314–16. Comstock told Dr. Baker that during school she had a B or C average and did not have a learning disability in regular classes. AR 314. She stated her longest employment was for about one year ten years ago at a casino, but that her last job at Edge Telecommu-nications Services lasted for about a year-and-a-half until there were lay-offs in February. *Id.* However, Comstock also said she was fired for not having enough sales. *Id.* Dr. Baker concluded:

> In regards to mental limitations related to work activities, Mrs. Comstock would seem to have the cognitive ability to remember and understand instructions, procedures, and locations. Depressive state may affect maintaining adequate attention, concentration, and pace for carrying out instructions. She does not appear to suffer from significant social anxiety or difficulties that would interfere with ability to interact. There is not [sic] reason to expect adequate judgment could not be utilized in the workplace.

AR 316.

### C. Function Reports

Comstock completed a function report in which she stated it is hard for her to focus on things. AR 185. She also reported experiencing a lot of pain, especially when walking, using her hands, lifting or standing. *Id.* She reported she can walk about 10 steps slowly before she needs to stop to rest. *Id.*

Comstock's husband completed a third party function report. AR 170–77. He noted that Comstock would wake up several nights a week crying because of body pain. AR 171. He stated she no longer cooks as much as she used to because she experiences pain when working with her hands or standing too long. AR 172. Mr. Comstock stated her condition affects her ability to lift, stand, walk, climb stairs, complete tasks, and use her hands, and also affects her memory and concentration. AR 175. He explained that she has a lot of problems with her hands, hips, legs, and arms. *Id.* He said she would often get

confused and put things where they did not belong. *Id.*

#### D. State Agency Medical Consultants

Jan Hunter, D.O., performed a physical RFC assessment based on Comstock's primary diagnosis of fibromyalgia. AR 317–24. Dr. Hunter found that Comstock could occasionally lift 20 pounds, frequently lift 10 pounds and stand, walk or sit about six hours in an eight-hour workday. AR 318. Dr. Hunter summarized the medical evidence and wrote:

> The claimant's allegations are partially credible in that she has a diagnosis of fibromyalgia from her family physician. She reports increased pain with any movement. However, other than tender and control points, her CE was entirely normal. She reports 7 migraines per month, but has sought no treatment. The claimant reports no problems with self-cares. She does the laundry and dishes. She makes easy meals, drives, and shops in stores.

AR 319.

Beverly Westra, Ph.D., performed a mental RFC assessment and psychiatric review technique on October 24, 2008. AR 325–42. Dr. Westra found that Comstock had moderate limitations in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, and respond appropriately to changes in the work setting. AR 325–26. In all other areas, Dr. Westra found she was not significantly limited. *Id.* In the narrative section of the RFC assessment, Dr. Westra first summarized the medical evidence. She then noted Comstock's activities of daily living were grossly intact. AR 327. A third party report noted that Comstock primarily had pain in her hands but she had no problems getting along with others or following instructions. *Id.* Dr. Westra found that Comstock's credibility was "significantly eroded by several blatant inconsistencies in her reports across sources." AR 328. She stated Comstock's social skills were broadly intact and "[t]he preponderance of evidence supports the ability to perform simple, routine and familiar tasks without significant difficulty." *Id.*

In conducting the psychiatric review technique, Dr. Westra found Comstock had mild limitations in her activities of daily living and maintaining social functioning, and moderate limitations in maintaining concentration, persistence, or pace. AR 339. The record showed she had no episodes of decompensation, each of extended duration. *Id.*

#### Hearing Testimony

#### A. Claimant's Testimony

Comstock testified at her hearing that she was forty-two years old and completed school up to the ninth grade. AR 33. She did not have her GED and indicated that she tried to work on it, but mentally could not do it. *Id.* She said she had a reading disability, which was evaluated in elementary school and made it hard for her to remember what she read. AR 34. She was married and living with her husband in Sioux City, Iowa. She testified that she has five children from previous marriages, who are living with their fathers for financial reasons. AR 36. Comstock pays child support and sees her children on a regular basis. AR 35. Comstock said her children have not lived with her for the past ten years, but she stayed at home to care for them when they were younger. AR 37. Later when Comstock started working, she said her wages were garnished to pay child support. AR 36–37.

Comstock's longest job was at a casino where she worked as a machine attendant.

AR 37. She served drinks and food and provided cash tokens. *Id.* Comstock said she quit this job because her migraines were getting worse from the noise and flashing lights. AR 38, 45. Comstock also worked in a tobacco warehouse and in a gas station. AR 39. At the gas station, she took money and filled up propane bottles. AR 39–40. She quit this job because the propane was making her migraines worse. AR 40. She quit the cashiering job at the tobacco warehouse because her husband's job required her to move. *Id.* She said the cashiering job was a good job for her at the time, but she could not perform it today. *Id.* Comstock explained that she would not be able to stand for the time required at this job. AR 43–44. She said that she has to lie down four or five times a day and nap because her muscles get too sore. AR 44. She had tried to work in fast food and could not do it. AR 40.

Comstock also testified that she experiences a migraine every day as a side effect of one of her medications. AR 45. She previously had migraines one to four times a week. *Id.* Before her heart attack, she had a migraine once a week that would last five or six hours. *Id.* She said she would have to go in a dark room until it went away and then she would sleep for the rest of the day. *Id.* She explained that she takes medication for her migraines. *Id.*

As for her daily activities, Comstock testified she drives her husband to and from work, and during the day she would go to her appointments or rest on the couch. AR 46–47. She stated she used to spend an hour a day on the computer but stopped because the flashing lights bothered her.

AR 46. The ALJ asked if she would travel with her husband to go to casinos or go fishing as her husband had testified in a prior hearing. *Id.* Comstock said they did not. AR 47. She stated that she liked to cook but rarely did anymore. *Id.* She would talk on the phone to her children at least three to four times a day and would see them every week. *Id.*

### B. Vocational Expert's Testimony

The VE testified that the Dictionary of Occupational Titles ("DOT") does not identify Comstock's past job as a machine attendant. However, he stated it was a combination of the jobs of a cashier, change person, and cocktail waitress. AR 48–49. He did not consider Comstock's jobs as a fast food worker or telephone solicitor to be past relevant work because she did not perform those long enough. AR 49.

The ALJ asked the VE the following hypothetical:

The first hypothetical is for light, unskilled work. If the Claimant could occasionally lift or carry 20 pounds, frequently lift or carry ten pounds; stand, sit, walk at least six hours in an eight-hour day; could occasionally do all postural activities, climb, balance, stoop, kneel, crouch, crawl. Then from a mental standpoint, only unskilled work SVP [2] : 1, 2; work that is routine and repetitive; doesn't require extended concentration or attention or goal setting. With that functional capacity, could she do the type of three, the three jobs that you have identified were performed in that composite job?

---

**2.** "SVP" refers to Specific Vocational Preparation, defined in Appendix C of the *Dictionary of Occupational Titles* as being "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." An SVP of 1 or 2 is associated with unskilled work and requires a short demonstration only or anything beyond a short demonstration up to and including 1 month. *See Dictionary of Occupational Titles,* Appendix C.

AR 49. The VE testified Comstock could perform the cashiering and change person jobs as she performed them, but not the waitressing job because it is considered semiskilled. *Id.* The VE indicated the cashiering job was unskilled and light and existed in significant numbers in Iowa and nationwide. AR 49–50. He stated the change person job was considered medium work by the DOT, but Comstock performed it as light. AR 50. Therefore, Comstock would only be able to perform her past relevant work as a cashier under the hypothetical provided by the ALJ. The VE testified that other types of light work included fast food work and receptionist work or interviewing-type work that could be performed as light or sedentary. *Id.* All of these jobs also existed in significant numbers in Iowa and nationwide. *Id.* The VE thought Comstock could perform about 95 percent of the full range of sedentary work and 60 percent of the full range of light work under the hypothetical. AR 51.

Comstock's attorney asked if Comstock could perform any of the jobs identified by the VE if the ALJ were to believe Comstock's testimony. AR 52. The VE thought she could not. He explained that Comstock's testimony indicated her migraines were too frequent and too severe and her need to lie down during the day would preclude her from employment. *Id.*

### Summary of ALJ's Decision

The ALJ made the following findings:

(1) The claimant has not engaged in substantial gainful activity since August 8, 2008, the application date.

(2) The claimant has the following severe impairments: Fibromyalgia; diabetes mellitus; migraine headaches; myocardial infarction in August 2010 with stent placement; and depression.

(3) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

(4) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b). She can occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds. She can stand, sit, walk at least 6 hours in an 8–hour day. She can occasionally do all postural activities, climb, balance, stoop, kneel, crouch, and crawl. She is limited to unskilled work, SVP 1 or 2, that is routine and receptive[3] and does not require extended concentration or attention or goal setting.

(5) The claimant has past relevant work in a composite job consisting of three jobs, cashier, change person, and cocktail waitress. She is capable of performing the cashier job. The change person job is not recognized as a light job in the Dictionary of Occupational Titles. She could not perform the cocktail waitress job, which is semi-skilled. Step 4—return to past work: The cashier job would not require the performance of work-related activities precluded by the claimant's residual functional capacity.

(6) The claimant has not been under a disability, as defined in the Social Security Act, since August 8, 2008, the date the application was filed.

AR 12–18.

The ALJ first discussed the nature of each of Comstock's severe impairments,

---

3. Presumably, the ALJ meant "repetitive."

including treatment and whether they imposed any functional limitations. The ALJ found that Comstock's cardiac impairment was severe, but not anticipated to meet or equal a listed impairment for at least twelve continuous months. AR 12. She noted that after her stent placement, Comstock was not able to lift more than the equivalent of a gallon of milk, but the record failed to establish that her cardiac impairment caused permanent functional restrictions. AR 15.

Comstock's depression was treated through medication and counseling with Ms. Crew. *Id.* The ALJ indicated it was most serious in October 2010, when Comstock was recovering from her cardiac surgery and had not been taking her antidepressants because she could not afford them. *Id.* The ALJ noted no treating source opinions were available from Ms. Stoos or the physician's assistant at Siouxland Mental Health Center. *Id.* Dr. Baker, the consultative examiner, found Comstock could function effectively in a work setting with her depression, but it could affect her ability to maintain attention, concentration, and pace. *Id.*

Comstock's diabetes mellitus was stable and the ALJ concluded it did not appear to be a central feature of Comstock's allegations of disabling impairments. Finally, the ALJ noted there were no opinions from Comstock's treating source for her fibromyalgia, and she relied on the opinion of Dr. Martin, the consultative examiner. *Id.* He concluded she could lift or carry 30 to 35 pounds, frequently lift or carry 15 to 20 pounds and constantly lift or carry 5 to 10 pounds. *Id.* He had no concerns about her ability to stand, move about, walk, sit, stoop, climb, kneel or crawl. *Id.*

The ALJ concluded this evidence presented an RFC for a wide range of light work. She stated she had given weight to Dr. Martin's opinion and that "[h]e is a treating physician and an examining

source. His opinion is based on clinical findings and is consistent with other substantial medical evidence of record." AR 16. The ALJ also acknowledged a previous application, which was denied by a different ALJ on October 5, 2004. *Id.* The ALJ incorporated this decision by reference, noting the impairments alleged in that application were conversion disorder and mixed vascular headaches. *Id.*

The ALJ then considered credibility stating, "[T]he claimant described restrictions that appear out of proportion to her impairments." *Id.* She noted that Comstock's daily activities as described in April 2010, were limited to taking her husband to work, briefly using the computer as recommended by a physician, attending one or more doctor appointments per week, picking her husband up from work, and watching television. *Id.* Comstock said she took medication for her migraines and depression as prescribed, but it was ineffective. The ALJ noted that in April 2010, Comstock alleged she would experience a migraine headache every other day that would last for two to three hours, during which time she needed to sleep. *Id.* The ALJ discredited the severity of Comstock's migraine headaches noting that the alleged frequency and duration of her headaches seemed inconsistent with her daily activities and was not entirely substantiated by the medical evidence. *Id.*

The ALJ also discussed Comstock's earnings record, which showed she had worked at the level of substantial gainful activity only in the year 2000. Her most recent work was in 2008, but not at the level of substantial gainful activity. AR 16. The ALJ acknowledged that Comstock said she did not work when her children were younger because she stayed at home to care for them. Her children had not lived with her since 2001, at which time Comstock began work as a machine

attendant. *Id.* The ALJ noted Comstock had applied for disability in 2003 and was denied, but for most years since 2001, her earnings record showed zero or low earnings, even for years when she was not alleging disability.

Finally, the ALJ discussed the function report completed by Comstock's husband. *Id.* She discredited the allegations in this report based on his relationship to Comstock and his testimony at a previous administrative hearing in 2004 as part of a different disability application in which he stated they went fishing, visited casinos and traveled to Minnesota. *Id.*

The ALJ concluded that Comstock could perform both her past relevant work as a cashier and other work such as a fast food worker, receptionist and interviewer that is available in the national economy. Therefore, the ALJ concluded Comstock was not disabled as of August 8, 2008.

### Disability Determinations and the Burden of Proof

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists ... in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process out-

lined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue,* 500 F.3d 705, 707 (8th Cir.2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart,* 353 F.3d 602, 605 (8th Cir.2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby,* 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, coworkers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert,* 482 U.S. 137, 141, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue,* 484 F.3d

1040, 1043 (8th Cir.2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan,* 133 F.3d 583, 588 (8th Cir.1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir.2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain nonmedical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel,* 205 F.3d 356, 358–59 n. 5 (8th Cir.2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart,* 390 F.3d 584, 591 (8th Cir.2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart,* 377 F.3d 801, 806 (8th Cir.2004).

### The Substantial Evidence Standard

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart,* 433 F.3d 575, 577 (8th Cir.2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support

a conclusion." *Lewis,* 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala,* 30 F.3d 934, 939 (8th Cir.1994).

▮ In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart,* 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue,* 607 F.3d 533, 536 (8th Cir.2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart,* 349 F.3d 549, 555 (8th Cir.2003) (citing *Cline v. Sullivan,* 939 F.2d 560, 564 (8th Cir.1991)).

▮ In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.,* 879 F.2d 441, 444 (8th Cir.1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin,* 349 F.3d at 555 (citing *Bates v. Chater,* 54 F.3d 529, 532 (8th Cir.1995)), or "review the factual record de novo." *Roe v. Chater,* 92 F.3d 672, 675 (8th Cir.1996) (citing *Naber v. Shalala,* 22 F.3d 186, 188 (8th Cir.1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm

the [Commissioner's] denial of benefits." *Kluesner,* 607 F.3d at 536 (quoting *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson,* 30 F.3d at 939 (quoting *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir.1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir.1984); *see Goff v. Barnhart,* 421 F.3d 785, 789 (8th Cir.2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

### Discussion

### A. Evaluation of Medical Opinions

▮ Comstock argues the ALJ gave improper weight to the opinion of Dr. Martin, the consultative examiner, by elevating it to the level of a treating physician opinion. She also argues the ALJ erred by ignoring the opinion of Dr. Baker, the other consultative examiner. The Commissioner responds that the ALJ inadvertently referred to Dr. Martin as a treating physician and examining source, but had correctly acknowledged earlier in the decision that Dr. Martin completed a consultative examination. In addition, the Commissioner argues the ALJ gave valid reasons for weighing the medical opinions as she did and the inadvertent misstatement does not override the ALJ's proper analysis of the medical opinions.

In assessing the medical evidence, the ALJ noted there were no treating source opinions from Ms. Stoos or Dr. Wisco. She went on to state:

· On October 7, 2008, Douglas Martin, M.D., completed a consultative medical examination of the claimant and stated that he could not confirm the diagnosis

of fibromyalgia. He noted her history of widespread muscle and joint pain of unclear etiology. He opined that depression was a likely diagnosis. He opined that she could occasionally lift or carry 30 to 35 pounds, frequently lift or carry 15 to 20 pounds, and constantly lift or carry 5 to 10 pounds. He said he had no particular concerns about her ability to stand, move about, walk, or sit. Likewise, he stated that he had no particular concern about the claimant's ability to stoop, climb, kneel, or crawl. He imposed no restriction on manipulative, communicative, visual or environmental activities.

This is essentially the residual functional capacity for a wide range of light work. As provided by SSR 06–3p, the undersigned has given weight to Dr. Martin's opinion. He is a treating physician and an examining source. His opinion is based on clinical findings and is consistent with other substantial medical evidence of record.

AR 15–16.

■ A treating physician's opinion is generally entitled to "substantial weight," but it does not automatically control because the ALJ must evaluate the record as a whole. *Wilson v. Apfel,* 172 F.3d 539, 542 (8th Cir.1999). Generally, "the report of a consulting physician who examined the claimant once does not constitute "substantial evidence," especially when contradicted by the evaluation of the claimant's treating physician." *Cantrell v. Apfel,* 231 F.3d 1104, 1107 (8th Cir.2000). However, "an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." *Prosch v. Apfel,* 201 F.3d 1010, 1014 (8th Cir.2000). The ALJ must consider the following factors in deciding the weight to give any medical opinion:

(1) length of the treatment relationship and the frequency of examination,

(2) nature and extent of the treatment relationship,

(3) supportability,

(4) consistency [with the record as a whole], specialization,

(5) other factors [which tend to support or contradict the opinion].

20 C.F.R. § 404.1527(c).

Here, the ALJ acknowledged that Dr. Wisco, Comstock's treating physician for fibromyalgia, did not provide a medical opinion about Comstock's physical work-related limitations. Comstock saw Dr. Wisco in January 2009 for her fibromyalgia. AR 347–49. In his assessment, he wrote that her total body pain process was most consistent with fibromyalgia, but that it was difficult to see any objective evidence of an inflammatory disorder. AR 349. For treatment, he recommended Comstock begin a regular exercise program with a very graduated set of simple exercises. *Id.* He prescribed her gabapentin and asked her to follow up in a couple months. *Id.* There are no subsequent reports from Dr. Wisco in the record.

Although the ALJ erred by stating Dr. Martin was a treating physician, it appears this was an inadvertent misstatement that had no effect on the outcome. *See Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir.2004) ("We will not set aside an administrative finding based on an arguable deficiency in opinion-writing technique when it is unlikely it affected the outcome."). The ALJ acknowledged in the preceding paragraph that Dr. Martin provided a consultative examination and the ALJ did not err by relying on Dr. Martin's opinion to determine the functional limitations caused by Comstock's fibromyalgia.

■ The claimant's RFC is a medical question. *Singh v. Apfel,* 222 F.3d 448,

451 (8th Cir.2000). Some medical evidence "must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir.2001) (internal quotation marks and citation omitted). Dr. Martin's opinion provides medical evidence of Comstock's functional abilities, and is consistent with Dr. Wisco's findings. Dr. Martin indicated he could not confirm that Comstock had fibromyalgia, but said her symptoms seemed inconsistent with rheumatoid arthritis. AR 307. Dr. Wisco likewise remarked that he did not see any serious arthritis problems, and discussed the "probability" that she had fibromyalgia. AR 349. The ALJ noted that Dr. Martin's opinions were "consistent with other substantial medical evidence of record." AR 16. The ALJ did not err in relying on Dr. Martin's opinion concerning the functional limitations associated with Comstock's fibromyalgia.

■ Comstock's next argument is that the ALJ ignored the limitations provided by Dr. Baker, who was the psychological consultative examiner. Comstock notes that Dr. Baker found her recall, memory and concentration were fair. AR 316. He also concluded her depressive state "may affect maintaining adequate attention, concentration, and pace for carrying out instructions." *Id.* The Commissioner argues the ALJ's RFC determination is consistent with Dr. Baker's opinion, and even though the ALJ did not specify how much weight she assigned it, it can logically be inferred the opinion was given great weight.

■ The ALJ clearly discussed Dr. Baker's opinion. She wrote:

On October 7, 2008, Michael Baker, Ph. D., completed a consultative psychological evaluation of the claimant and rated her Global Assessment of Functioning ("GAF") at 55, indicating moderate symptoms. His diagnosis was major depressive disorder by history. (Exhibit B–5F) He opined that she could function effectively in a work setting but concluded that her depression could affect her ability to maintain attention, concentration, and pace. (Exhibit B–5F)

AR 15. Comstock does not specifically address what is insufficient about this consideration. In conjunction with this argument she cites case law on the different weight that is to be given to treating sources and non-examining sources, but makes no argument as to how this applies to Dr. Baker. As the Commissioner points out, Dr. Baker is neither a treating source nor a non-examining source, but is a consultative examiner, meaning that he has examined the claimant on at least one occasion. The weight to be given to his opinion is determined by the factors listed under 20 C.F.R. § 404.1527(c). The ALJ is not required to give reasons for the weight given to Dr. Baker's opinion because he is not a treating source. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

In her RFC determination, the ALJ included limitations of "unskilled work, SVP 1 or 2, that is routine and [repetitive] and does not require extended concentration or attention or goal setting." AR 14. These limitations are consistent with those identified by Dr. Baker. I find that the ALJ properly evaluated Dr. Baker's opinion and included those limitations in the RFC determination that were supported by the record as a whole.

The ALJ's evaluation of the medical opinions is supported by substantial evidence in the record. Although she referred to Dr. Martin as a treating physician instead of a consultative examiner, this misstatement did not affect the analysis and the ALJ properly relied on Dr.

Martin's opinion to determine Comstock's functional limitations as a result of her fibromyalgia. The ALJ also considered the opinion of Dr. Baker and appropriately included the limitations he identified in the RFC determination.

### B. Credibility Determinations

■ Comstock alleges the ALJ erred by discrediting her subjective complaints because she failed to detail the reasons for discrediting her testimony and set forth the inconsistencies found. Specifically, she disagrees with the ALJ that her daily activities are inconsistent with the activities that a disabled person with migraines could occasionally perform. She argues that she does not need to prove that the pain from her physical impairments precludes all productive activity and that activities such as household chores and watching television do not detract from her subjective complaints of pain. Finally, Comstock argues the ALJ erred by discrediting her husband's function report based partially on his testimony from a previous administrative hearing in 2004 for a different disability application submitted by Comstock.

The Commissioner argues the ALJ gave legitimate reasons for discrediting Comstock's allegations, which are supported by the record. He also argues the ALJ properly identified inconsistencies between Comstock's allegations and the objective medical evidence. Finally, the Commissioner argues the ALJ appropriately considered Comstock's earnings record and discredited Comstock's husband based on the fact that he was not a disinterested third party witness.

■ The standard for evaluating the credibility of a claimant's subjective complaints is set forth in *Polaski v. Heck-*

*ler,* 739 F.2d 1320, 1322 (8th Cir.1984). The ALJ must consider the claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. *Polaski,* 739 F.2d at 1322. The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant. *Wheeler v. Apfel,* 224 F.3d 891, 895 (8th Cir.2000). The ALJ does not need to explicitly discuss each factor as long as he or she acknowledges and considers the factors before discrediting the claimant's subjective complaints. *Goff,* 421 F.3d at 791. "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh,* 222 F.3d at 452. The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart,* 393 F.3d 798, 801 (8th Cir.2005).

In assessing the credibility of Comstock's subjective allegations, the ALJ considered the *Polaski* factors but did not provide good reasons for discrediting some of Comstock's subjective complaints. The ALJ noted Comstock's daily activities were limited to taking her husband to work, briefly using the computer as recommended by a physician, attending one or more doctor appointments per week, picking her husband up from work, and watching television. AR 16. The ALJ found these activities were inconsistent with the alleged frequency and duration of Comstock's migraine headaches, which the ALJ noted were every other day for two to three hours, during which time Comstock said she needed to sleep.[4] AR 16, 239.

---

4. As noted above, Comstock testified that since her heart attack she experienced migraines every day that would last five to six hours due to medication. AR 44–45. She stated her migraines occurred once per week before she had her heart attack. AR·45.

While credibility determinations are primarily for the ALJ to make, I need only "defer to the ALJ's determinations regarding credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams*, 393 F.3d at 801. I find that the ALJ has not provided a good reason or identified a legitimate inconsistency here. It is very likely that Comstock is able to perform all her daily activities as alleged, and sleep for two to three hours whenever a migraine comes on. Also, "a claimant need not prove she is bedridden or completely helpless to be found disabled." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir.1989). "[T]he ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." *Baumgarten v. Chater*, 75 F.3d 366, 369 (8th Cir.1996) (quoting *Hogg v. Shalala*, 45 F.3d 276, 278 (8th Cir.1995)).

The ALJ also discredited the severity of Comstock's migraines based on the fact that Comstock was taking her anti-migraine and anti-depressant medication as prescribed, but claimed it was ineffective. AR 16, 240. The ALJ found that this "seemingly defeat[ed] the purpose of using the medication." AR 16. This is a disturbing, and seemingly disingenuous, finding. Indeed, I have no doubt that if Comstock would have *failed* to take the medication as prescribed, the ALJ would have cited that failure as a reason to discredit Comstock's testimony. I reject the ALJ's conclusion that following a physician's advice and taking medication as prescribed is a factor that somehow undermines a claimant's credibility. Instead, as this court has noted: "If a claimant takes all the medication which she is prescribed, and does so for a number of years and yet continues to have severe medical problems, such events only further validate the claimant's subjective complaints of pain." *Orr v. Chater*, 956 F.Supp. 861, 875 (N.D.Iowa 1997).

The only other reason the ALJ provided for discrediting the severity of Comstock's migraines was that the alleged frequency and duration of her headaches was not entirely substantiated by medical evidence. However, an ALJ may not disregard subjective complaints "solely because the objective medical evidence does not fully support them." *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir.2003); *see also Polaski*, 739 F.2d at 1322. Because the ALJ's other two reasons for discrediting Comstock's subjective allegations are not valid, the ALJ's credibility determination on the effects of Comstock's migraines improperly rests on the lack of objective medical evidence alone. As such, the ALJ's decision must be reversed and remanded for the ALJ to reconsider Comstock's subjective complaints and further develop the record on the severity and limitations of Comstock's migraines if necessary. *See Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir.2003) (reversing where the ALJ's multiple reasons for discrediting the claimant were unsupported by the record because the supposed inconsistencies were not actually inconsistent and the ALJ relied on improper reasons to hold otherwise).

The only other factor the ALJ discussed in determining Comstock's general credibility was her earnings record. AR 16. The ALJ remarked that since 2003, and during the years she has not alleged disability, Comstock's earnings record shows zero or low earnings. Work history is a proper factor to consider in determining credibility. *See Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir.2004) (finding the ALJ properly discredited claimant in part due to his sporadic work record reflecting relatively low earnings and multiple years with no reported earnings show-

ing a potential lack of motivation to work). However, based on the record in this case I find that this is an improper basis to discredit Comstock because it is not supported by substantial evidence.

The ALJ stated that Comstock had not attempted to work during the times she was not claiming disability, which could demonstrate a lack of motivation to work. However, the ALJ also acknowledged that Comstock has been applying for disability for six or more years. AR 10, 27–29. Comstock's alleged onset date in her previous application was October 1, 2002. AR 61. Her current alleged onset date is August 8, 2008. Because the ALJ acknowledged that Comstock has been alleging disability since 2002, she should not have used Comstock's earnings record to discredit her. Working, while at the same time applying for disability benefits, would have been inconsistent and, of course, would have been used as a basis to deny Comstock's applications. The ALJ erred in discounting Comstock's credibility on grounds that she did not pursue work while seeking disability benefits.

■■■ Finally, with regard to Comstock's husband's credibility, I find that the ALJ improperly discredited his third party function report from August 2008 based on his testimony at a previous disability hearing. That hearing took place four years prior to Comstock's alleged onset date and involved different allegations of disabling impairments. His testimony about Comstock's activities in 2004 is irrelevant to Comstock's current application, which alleges different impairments and a different alleged onset date of August 8, 2008. However, the ALJ also discredited his report based on the nature of his relationship to Comstock and for the reasons Comstock's own testimony was discredited. Had the ALJ identified adequate reasons for discrediting Comstock, these would have been good reasons for discrediting

Mr. Comstock as well. *See Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir.2000) (ALJ's failure to give specific reasons for disregarding testimony of claimant's husband was inconsequential, as same reasons ALJ gave to discredit claimant could serve as basis for discrediting husband).

Because the ALJ did not provide good reasons for discrediting Comstock's subjective complaints regarding the effects of her migraines, I find that remand is necessary for the ALJ to reevaluate the credibility of these complaints and further develop the record, if necessary. On remand, the ALJ shall set forth in detail her reasons for finding Comstock's subjective complaints to be credible or not credible. If the ALJ finds Comstock's complaints to be not credible, she shall fully explain the reasons and/or inconsistencies for her credibility determination. The ALJ shall also reassess the credibility of the third party function report.

### C. Hypothetical Question to the VE

Comstock argues the hypothetical question to the VE was incomplete because it did not consider all of Comstock's credible limitations regarding her migraines and her need to lie down during the day. Because the VE stated that Comstock would not be able to perform other work available in the national economy if Comstock's testimony was fully credited, Comstock argues the ALJ's decision should be reversed.

■■■ The hypothetical question must only include impairments that are supported by the record and those that the ALJ accepts as valid. *Howe v. Astrue,* 499 F.3d 835, 842 (8th Cir.2007) (citing *Prosch,* 201 F.3d at 1015). "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." *Hunt v. Massanari,* 250 F.3d 622, 625 (8th Cir.2001) (citing *Taylor v. Chater,* 118 F.3d 1274, 1278 (8th Cir.1997)). "If a hypotheti-

1160

cal question does not include all of the claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability." *Baker v. Apfel,* 159 F.3d 1140, 1144 (8th Cir.1998).

Having previously found that the ALJ erred in her credibility determination, the ALJ's hypothetical question may not include all of Comstock's impairments or limitations. "When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence." *Hunt,* 250 F.3d at 626 (citing *Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994)). Remand is necessary for the ALJ to reevaluate Comstock's subjective complaints on the severity and limitations of her migraines. Depending on these findings, the ALJ may need to obtain additional VE testimony based on a different hypothetical question that encompasses all of Comstock's credible limitations.

### Conclusion

Because the ALJ did not conduct an appropriate credibility analysis, I must remand this case for further proceedings, including any necessary development of the record regarding the severity and limitations of Comstock's migraines. Depending on the outcome of this analysis, it may be necessary for the ALJ to obtain additional VE testimony in response to a hypothetical question that accurately reflects Comstock's limitations. Accordingly, the Commissioner's decision is hereby **reversed** and this case is **remanded** for further proceedings consistent with the above opinion.

**IT IS SO ORDERED.**